UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW AARON BROWN,<br><br>    Petitioner,<br><br>    v.<br><br>PARAMO,<br><br>    Respondent. | Case No. 17-cv-03948-JD<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

Matthew Aaron Brown, a pro se state prisoner, has brought a habeas petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and Brown filed a traverse. The petition is denied.

## BACKGROUND

A jury found Brown guilty of second degree murder and found true the allegation that he personally used a firearm. *People v. Brown*, No. A144660, 2016 WL 6744989, at *1 (Cal. Ct. App. Nov. 15, 2016). On March 11, 2015, Brown was sentenced to prison for 40 years to life. Clerk's Transcript ("CT") at 297, 329. On November 15, 2016, the California Court of Appeal ordered the trial court to amend the judgment to properly reflect Brown's custody credits, but otherwise affirmed the judgment. *Brown*, 2016 WL 6744989, at *8. The California Supreme Court denied review on February 15, 2017. Answer, Exs. 8-9.

The California Court of Appeal summarized the facts of the crime as follows:

> Background to Shooting
>
> Scott Johnson and his girlfriend Johanna Hames lived in a house on Johnson's rural property near Alderpoint in Humboldt County. The victim, Neil Decker, was a close friend of Johnson and did odd jobs for him. Decker lived with his girlfriend Melisa Toner near Johnson and visited Johnson's home regularly.

Appellant was a family friend of Johnson who in 2013 came to work on a cleanup crew on Johnson's property. Appellant almost immediately began dating Kara Williams Kesler, who lived in a trailer in front of Johnson's home. Appellant moved in with Kesler and worked as a caretaker of Johnson's property. Appellant called Johnson "Pops" and then later "Dad."

Appellant, Decker, Kesler, Hames, and Toner were all methamphetamine users. Appellant and Decker disliked each other and had an ongoing feud. They came into particular conflict regarding the gate to Johnson's property. Appellant would get irritated when Decker left the gate open, and Decker would get irritated when appellant would lock the gate and interfere with Decker's comings and goings. Sometimes Decker would use bolt cutters to cut the lock.

Kesler testified Decker called appellant names, including "Bitch Boy." She heard Decker threaten appellant, including threats by Decker to sexually assault appellant. She testified appellant was scared of Decker and "truly terrified" of being sexually assaulted by Decker.

On one occasion, appellant and Decker had a physical altercation due to Decker's anger about appellant locking the gate. According to Kesler, Decker wanted to fight but appellant said he did not want to fight. Decker tackled appellant, causing them to roll down a hill together. Appellant again said he did not want to fight and ran to Johnson's house. The next day, Decker called appellant a "motherfucker" and acted as if he were going to pull out a gun, in order to scare appellant.

Subsequently, appellant and Decker were involved in an incident in which appellant sprayed another person with bear spray and Decker then sprayed appellant with pepper spray.

After the pepper spray incident, appellant began to carry a shotgun all the time. Kesler believed Decker wanted to beat up appellant; appellant did not want to fight. Neither Toner nor Hames had seen Decker with a gun.

Around the same time as the pepper spray incident, appellant began dating another woman and he moved out of the trailer he shared with Kesler. He moved in with Sarrie Stillwell, FN. 3 who lived in a trailer on her family's property in Alderpoint. Appellant told Sarrie people were trying to "kick him off the mountain."

> FN. 3 We refer to Sarrie Stillwell by her first name to avoid confusion with Michael Stillwell.

The Shooting

On July 18, 2014, Hames asked appellant to come and talk to Johnson about appellant's failure to do his work and his possession of tools belonging to Johnson. Appellant had recently been fired from his caretaker job because he had failed to do his work and had

2

removed tools from a locked tool shed. When appellant arrived at Johnson's house at about 8:30 p.m., he was carrying a shotgun over his shoulder. Johnson and Hames were at the house, along with Decker, Toner, Kesler, and Kesler's new boyfriend Kai.

Appellant went upstairs to see Johnson in his bedroom. Decker and Hames were in the office adjacent to the bedroom. Hames testified Decker heard appellant mention him; Decker went to the bedroom, had an exchange with appellant, and then returned to the office. Appellant and Johnson discussed the tools that appellant had taken. Appellant mentioned a welder Decker sold to Johnson; Decker overheard the remark and entered the bedroom a second time, saying "Why are you talking about this? This is none of your business." Hames described Decker as annoyed but calm; Kesler, who also was present at that point, described Decker as angry. After some further exchange about the welder, Hames heard appellant swear at Decker. Hames testified that "it hadn't been like an angry, cussing conversation, so to hear [appellant] cuss at [Decker], I know it took me by surprise, because it had been a conversation between three guys about some stupid welder."

The next thing Hames heard from Johnson's bedroom was a gunshot. Hames went to the bedroom and saw Decker grabbing his chest. Toner ran to the bedroom, saw Decker fall to the floor, and heard him say, "He shot me in my fucking heart." Johnson angrily said to appellant, "You just killed my best friend!" Hames screamed at appellant, "You shot Neil!" Johnson struggled with appellant over the shotgun. Appellant seemed frightened and said to Johnson, "What are you doing, Dad?" After Johnson got the shotgun, appellant jumped from a balcony to the ground outside. Decker died from a single shotgun wound to the chest. FN. 4

> FN. 4 Johnson was not available to testify regarding the shooting because he was killed four days later.

According to Sarrie Stillwell, appellant was wearing a bulletproof vest when he left to go to Johnson's house the day of the shooting. Appellant and Sarrie had used methamphetamine together earlier in the day. When appellant returned, he looked scared and told Sarrie he had shot Decker because Decker "came at him" and he "had to defend himself."

Several days later, appellant was found hiding in a cabin. Following his arrest, he was interviewed by the police. Appellant claimed he was not present at the shooting, he knew nothing about it, and people were trying to set him up. Appellant claimed he was "a fall guy" because he was an "outsider." He acknowledged a history of conflict with Decker, including a physical fight and spraying Decker with bear mace when Decker tried to "jump" him.

Prior Violent Acts By Decker

Appellant presented evidence at trial regarding prior violent acts by Decker.

Michael Stillwell testified regarding an occasion when he did a

3

marijuana deal with Decker's then girlfriend while Decker was in jail. When Decker got out of jail he told Stillwell he should not have done the deal with the girlfriend. Decker hit Stillwell with a bottle, splitting open the back of his head. Stillwell never told appellant about the incident.

Greg Benson, who said Decker was his best friend, testified Decker once accidentally shot him. He explained that Decker was putting a gun down when it fell over and fired; the bullet grazed Benson. Benson said Decker did not own guns or like them, and he did not know why Decker had the gun that misfired.

A defense investigator testified Kesler told him Decker was a bully who intimidated appellant with behavior such as "chest bumping, feigning reaching behind his back as though for a handgun in his waistband, things of that nature."

There was also testimony that the Alderpoint area had a reputation for guns and violence; a police sergeant referred to the area as the "wild west" due to its lawlessness.

Appellant's Testimony

Appellant testified he was raised in Southern California and came to Humboldt County to work for Johnson. He looked up to Johnson.

Johnson told appellant the police did not come out to the area and people took the law into their own hands. For example, Johnson told him about an incident when a neighbor stuck a gun in a person's mouth over a property dispute. Johnson told appellant about an incident when Decker shot Benson. He heard from Stillwell's daughter (presumably Sarrie) about "aggression" by Decker involving Stillwell.

Appellant said Johnson had a handgun hidden under his bed's headboard, as well as other guns elsewhere on the property. Appellant had seen Decker with a gun.

Appellant recalled an occasion in November 2013 when Decker left Johnson's house with three others, saying they were going to look for someone named Quentin. They had guns. Later appellant saw Decker and one of the others (named Bob) in a car with a blindfolded person who he was told was Quentin. Decker and Bob told appellant they had kidnapped Quentin to force him to show them the location of the body of someone named Garrett Rodriguez.

About two months before the shooting, appellant pepper or bear sprayed Bob because Bob was coming at him, and then Decker pepper sprayed appellant. About one month before the shooting, appellant and Decker had a physical fight after arguing about appellant closing the gate to the property. Decker backed appellant up against a machine, appellant struck Decker once, Decker tackled appellant, and appellant ran away. After the fight, Decker swore he would kill appellant. Appellant acquired a gun that he carried with him everywhere, "just waiting for that day that [Decker] was going to kill [him]."

4

> When appellant arrived at Johnson's house the night of the shooting, he encountered Decker outside. Decker became irritated by appellant's extremely bright head lamp. Appellant was armed with a shotgun and a toy gun that looked real. He went upstairs to meet with Johnson in his bedroom. Decker, who appeared to be angry, entered and exited the bedroom twice. He entered a third time when appellant and Johnson began to discuss a welder that Decker had sold to Johnson. In his testimony, appellant asserted Decker had stolen the welder from Johnson and sold it to someone else. Decker told appellant to "keep [Decker's] name out of [appellant's] mouth." Then Decker said "it's over" and that he was "sick of" appellant. Decker started to come around the bed. He was holding his hand behind his back. Appellant thought Decker was going to kill him "right there," so appellant shot Decker. Appellant admitted he saw no guns in the room and never saw Decker holding a weapon. He claimed he "felt cornered" and was "pretty panicked, pretty scared."
>
> Appellant admitted he lied to the police about the shooting after he was arrested. He said he lied because he was very scared.

*Brown*, 2016 WL 6744989, at *1-4.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply

5

1 because that court concludes in its independent judgment that the relevant state-court decision

2 applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the

3 application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). In conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). In this case the Court looks to the opinion of to the California Court of Appeal for the claims in the petition.

As grounds for federal habeas relief, Brown contends that: (1) the trial court erred by precluding him from testifying about his knowledge of the victim's violent acts against third parties; and (2) trial counsel was ineffective to the extent he forfeited the prior claim by failing to present certain arguments to the trial court.

## EXCLUSION OF DEFENSE EVIDENCE

Brown argues that his constitutional right to present his self-defense claim was violated by the trial court precluding him from testifying about the victim's prior violent acts.

### Legal Standard

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A state court's evidentiary ruling therefore is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the

6

fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985).

The constitutional right to present a complete defense includes the right to present evidence, including the testimony of witnesses. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). But the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." *Id.* at 16. Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks omitted); *Michigan v. Lucas*, 500 U.S. 145, 151 (1991). This is true even if the rule under which it is excluded is "respected[,] . . . frequently applied," and otherwise constitutional. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). If the "mechanical" application of such a rule would "defeat the ends of justice," then the rule must yield to those ends. *Id.* Still, "[o]nly rarely" has the Supreme Court held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citing *Holmes*, 547 U.S. at 331) (rule did not rationally serve any discernable purpose); *Rock v. Arkansas*, 483 U.S. 44, 61 (1987) (rule arbitrary); *Chambers*, 410 U.S. at 302-03 (state did not even attempt to explain the reason for its rule).

**Background**

The California Court of Appeal set forth the relevant factual and legal background for this claim:

> I. Summary of the Excluded Testimony
>
> At trial, appellant presented testimony from Greg Benson regarding an incident in which Decker accidentally shot him. Appellant testified Johnson "told me about [Decker] shooting Mr. Benson," but the trial court sustained the prosecutor's objection to a follow-up question, "What did [Johnson] tell you about the Greg Benson shooting?" The court accepted the prosecutor's argument the testimony was prohibited because it involved "multiple levels of hearsay." In particular, because Benson testified that no one else was present at the shooting, Johnson necessarily heard the story he related to appellant from someone else.

7

Next, appellant presented testimony from Michael Stillwell regarding an incident in which Decker assaulted him with a bottle. During appellant's testimony, he was asked whether Stillwell had ever told him "anything, any aggression about Mr. Decker?" Appellant answered, "His daughter told me in front of him." Appellant was then asked, "And what did she tell you?" The prosecutor objected that the testimony would involve "multiple levels of hearsay. Mr. Stillwell already testified that he never discussed the matter with" appellant. The trial court sustained the objection. Appellant's counsel continued, "So you were told by—in front of, and without asking what someone said to you, a conversation that took place in front of Mr. Stillwell with his daughter?" Appellant answered in the affirmative.

Finally, appellant's counsel questioned appellant about his knowledge of Decker's involvement in the kidnapping of a person named Quentin. Appellant testified that in November 2013 he saw Quentin blindfolded in the front passenger seat of a car with Decker and someone named Bob. They told him they had gone to Quentin's house "and kidnapped him to make him show where Garrett Rodriguez's body was." Appellant had previously seen Decker, Bob, and two others leave Johnson's property saying they were going to go look for Quentin. They had guns. Appellant also attempted to testify he had been told that Quentin had been shot, but the trial court sustained a hearsay objection and struck the testimony.

On appeal, appellant describes the excluded testimony as follows: "the defense was precluded from establishing that appellant knew about three specific acts of violence by Neil Decker—the supposedly accidental shooting of Greg Benson, the injurious assault with a bottle on Mike Stillwell, and the apparent shooting of Quentin at the time of the kidnapping."

II. Jury Instructions and Legal Background

"'The doctrine of self-defense embraces two types: perfect and imperfect.'" (*People v. Iraheta* (2014) 227 Cal. App. 4th 611, 620.) "A killing committed in so-called perfect self-defense is neither murder nor manslaughter, but instead is justifiable homicide. [Citation.] 'For perfect self-defense, one must actually and reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.'" (*People v. Lopez* (2011) 199 Cal. App. 4th 1297, 1305, fn. omitted.) "[T]he defendant's fear must be of imminent harm. [Citation.] 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.'" (*Ibid*.) "If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter." (*People v. Humphrey* (1996) 13 Cal. 4th 1073, 1082 (*Humphrey*).)

The trial court instructed the jury concerning justifiable homicide in

8

self-defense in the language of CALCRIM No. 505, informing the jurors that, in order to acquit appellant based on the defense, they had to find he "reasonably believed that he was in imminent danger of being killed or suffering great bodily injury" and he "reasonably believed that the immediate use of deadly force was necessary to defend against that danger." The instruction also stated, "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed." The jurors were further instructed, "If you find that [Decker] threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable." Moreover, "If you find that the defendant knew that [Decker] had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable."

The trial court instructed the jury concerning voluntary manslaughter based on imperfect self-defense in the language of CALCRIM No. 571, informing the jurors that in order to acquit appellant of murder and instead convict him of voluntary manslaughter based on the defense, they had to find he "actually believed that he was in imminent danger of being killed or suffering great bodily injury" and he "actually believed that the immediate use of deadly force was necessary to defend against the danger," but "[a]t least one of those beliefs was unreasonable." The jurors were further instructed, "If you find that [Decker] threatened or harmed the defendant or others in the past, you may consider that information in evaluating the defendant's beliefs." Moreover, "If you find that the defendant knew that [Decker] had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs."

Appellant argues on appeal that the excluded testimony was relevant to his claim of self-defense. The trial court excluded the testimony as hearsay. Evidence Code section 1200, subdivision (a) defines hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." Evidence Code section 1200, subdivision (b) states, "Except as provided by law, hearsay evidence is inadmissible." On the other hand, evidence not offered for its truth is not barred by the hearsay rule. (*People v. Boyette* (2002) 29 Cal. 4th 381, 429 (*Boyette*); *see also People v. Marsh* (1962) 58 Cal. 2d 732, 737–738 (*Marsh*).) This includes statements offered for the purpose of "show[ing] the effect of the statements on" a defendant, where relevant to the issues at trial. (Boyette, at p. 429.)

We review the trial court's ruling on the admissibility of testimony for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

*Brown*, 2016 WL 6744989, at *4-5.

**Discussion**

The California Court of Appeal found that the trial court erred, but still concluded the error was harmless:

> The trial court erred . . . .
>
> In the present case, appellant's testimony regarding what he heard about Decker's past violence towards other persons would have been inadmissible hearsay to prove the truth of the incidents described to appellant. However, the testimony was relevant to support his claim he actually believed he was in imminent danger at the time of the shooting. As appellant argues, "appellant's testimony was offered to prove that he was aware of Neil Decker's violent acts against third parties, that his knowledge about those incidents contributed to his fear of imminent harm at the time of the shooting, and that therefore he shot Decker in either reasonable or unreasonable self-defense." The testimony at issue was admissible on that ground . . . . Indeed, the trial court's instructions on both perfect and imperfect self-defense properly recognized the relevance of appellant's knowledge of past violence by Decker towards third parties.
>
> Respondent acknowledges that "[w]hen a defendant claims either self-defense or imperfect self-defense in a murder prosecution, evidence of the victim's violent character may be relevant to show that the victim was the aggressor." Nevertheless, respondent argues the trial court did not err because "[i]t was only when appellant attempted to recount hearsay statements made by others to him that the trial court sustained objections for multiple hearsay." Respondent cites *People v. Arias* (1996) 13 Cal. 4th 92, 149, for the proposition that multiple hearsay "is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception." Respondent's argument is misplaced. Because the testimony about what appellant heard from others was admissible to show appellant's state of mind and not the truth of the statements made by others, the statements were not hearsay and no hearsay exception was necessary to justify their admission. (*See Boyette*, *supra*, 29 Cal. 4th at p. 429; *Marsh*, *supra*, 58 Cal. 2d at p. 738.)
>
> Although the trial court erred, we conclude the error was harmless. The erroneous exclusion of evidence does not require reversal except where the error caused a "miscarriage of justice." (Evid. Code, § 354.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal. 2d 818, 836; *accord People v. Richardson* (2008) 43 Cal.4th 959, 1001.) FN. 6
>
>> FN. 6 We reject appellant's contention the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 applies because the error violated

10

appellant's constitutional rights. The trial court's erroneous "'[a]pplication of the ordinary rules of evidence'" did not constitute an "error[ ] of constitutional dimension." (*Boyette*, *supra*, 29 Cal.4th at pp. 427–428.)

In support of his claim of prejudice, appellant argues that, although he was permitted to present evidence of his perceptions of danger at the time of the shooting and his recollection of Decker's past violence and threats towards him, he was unable to show he was aware of Decker's past violence towards others on three occasions, two of which included alleged shootings. In fact, appellant was permitted to testify without objection that Michael Stillwell's daughter told him about Decker's "aggression." Similarly, appellant testified without objection that Johnson "told [him] about [Decker] shooting Mr. Benson." It was only when appellant was asked to relate what he was told by Stillwell's daughter and Johnson that the People made objections that were sustained. Appellant argues, "[t]he jury could only have understood the trial court's rulings sustaining the hearsay objections as rendering the testimony inadmissible." However, the People only objected to the follow-up questions asking appellant to relate the particular statements made by Stillwell's daughter and Johnson. Appellant provides no basis for this court to assume the jury imputed the trial court's ruling to the prior unobjected-to testimony.

Thus, the jury actually heard that appellant knew about Decker's violence towards Michael Stillwell and shooting of Benson. The trial court did not permit appellant to relate precisely what he was told about those incidents, but, as appellant directs our attention to no offer of proof below, we have no basis to conclude he would have described those incidents in terms more egregious than those used in the descriptions by Stillwell and Benson at trial. (*See People v. Brady* (2005) 129 Cal.App.4th 1314, 1332 [" 'An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.] To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued.'"].) As to the third incident involving the kidnapping of Quentin, the only excluded testimony was that appellant was "just told that [the blindfolded person] was shot." Although it could be inferred from the context that Decker may have had some involvement, appellant apparently would not have testified he was told that Decker was the one who shot the blindfolded person.

Accordingly, for the purposes of our prejudice analysis, the only arguably significant effect of the trial court's erroneous rulings was the exclusion of appellant's testimony he was told Quentin had been shot by an unidentified person in unidentified circumstances. Although appellant's knowledge Decker may have been somehow associated with a prior shooting was relevant support for appellant's claim of fear at the time he shot Decker, it is not reasonably probable admission of that detail would have changed the outcome of the trial in light of the totality of the evidence.

11

> At the outset, we note the evidence supporting appellant's claim of imminent fear at the time of the shooting was weak. There was no testimony Decker was armed, and only appellant testified to any threatening statements or gestures by Decker immediately prior to the shooting. Appellant admitted he did not see any guns in the room and he never testified he thought Decker had a gun or other weapon, although it appears the defense intended the jury to infer he believed so.
>
> By comparison, there was extensive evidence in the record that appellant had good reason to fear Decker. Appellant and his girlfriend testified in detail regarding Decker's prior violence and threats. The reasonableness of appellant's fear of Decker was corroborated by the testimony showing Decker had some propensity to violence, especially Stillwell's testimony regarding Decker's assault. And appellant was permitted to testify he was aware of Decker's violence towards Stillwell and the shooting of Benson, although appellant was not permitted to relate what he was told about those incidents. Appellant also testified in detail about Decker's involvement with an armed group that kidnapped Quentin.
>
> In light of the evidence at trial, if the jury had been inclined to believe appellant's version of events at the time of the shooting, it is unlikely they would have rejected his claim of self-defense based on a lack of evidence appellant had reason to fear Decker. That is, when viewed in light of the totality of the evidence, the verdict suggests the jurors most likely rejected appellant's self-defense claim because they were skeptical of appellant's account of the shooting and his claim he feared imminent harm. It is not reasonably probable the additional information that appellant was told Quentin had been shot would have changed the jury's findings, because that testimony was relevant only to an issue that was already well supported in the record—appellant's general fear of Decker—rather than the weakly-supported and decisive issue of what happened at the time of the shooting. (*See Davis*, *supra*, 63 Cal. 2d at p. 658 ["After a review of the entire record we are persuaded that the uncontradicted testimony going to the deceased's character as a violent, dangerous man, and defendant's knowledge and reasonable belief to that effect, is so conclusive that the erroneous exclusion of further similar evidence could not have affected the jury's determinations."].) Accordingly, the trial court's errors in excluding aspects of appellant's testimony were not prejudicial.

*Brown*, 2016 WL 6744989, at *5-7 (footnote omitted).

In *Moses v. Payne*, 555 F.3d 742, 756, 758-59 (9th Cir. 2009), the Ninth Circuit noted that the Supreme Court had not specifically addressed whether a state evidentiary rule that led to the preclusion of evidence could lead to a violation of a defendant's right to present a defense. While *Moses* dealt with a state evidence rule regarding expert testimony, Brown has not identified any Supreme Court authority specifically on point for the facts of this case. Because the Supreme

12

Court has not squarely addressed the issue whether a trial court's exercise of its discretion in this context violates a defendant's constitutional right to present a defense, Brown is not entitled to federal habeas relief. *Moses*, 555 F.3d at 758-60; *see also Mendez v. Biter*, No. c. 10-5555 PJH (PR), 2013 WL 843554, at *15 (N.D. Cal. Mar. 6, 2013) (following *Moses* and finding no clearly established law governing petitioner's challenge to trial court's exercise of discretion to exclude defendant's impeachment evidence).

Assuming that the general Supreme Court authority regarding the right to present a defense applied in this context, Brown's claim still fails. The Court first notes that federal courts formerly applied the *Chapman* harmless-error standard to all criminal convictions tainted by trial error. *Chapman v. California*, 386 U.S. 18 (1967). Under this test "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. While the *Chapman* standard remains applicable to criminal convictions challenged on direct appeal, the Supreme Court has adopted a less strict standard for federal habeas corpus. *See Brecht*, 507 U.S. at 637-38. A habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

On direct appeal, California courts evaluate a constitutional error to determine whether it was "harmless beyond a reasonable doubt," *Chapman*, 386 U.S. at 24, but evaluate a non constitutional error to determine if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error," *People v. Watson*, 46 Cal. 2d 818, 836 (Cal. 1956). *Hall v. Haws*, 861 F.3d 977, 989 n.7 (9th Cir. 2017).

On direct appeal in this case, the California Court of Appeal held that the trial court erred in excluding the testimony. The court still affirmed Brown's conviction, finding the error to be harmless. The California Court of Appeal specifically declined to employ the *Chapman* standard, instead finding that the trial court's error was not an error of constitutional magnitude. *Brown*, 2016 WL 6744989, at *6 n.6. The state court applied the harmless-error standard set forth in *People v. Watson*. *Id*. at 6.

13

In *Hall*, the Ninth Circuit recently found that the state court's application of the *Watson* standard to an error of constitutional magnitude was an unreasonable application of clearly established federal law, even if the state court viewed the error as a non constitutional error rather than as a constitutional error. *See Hall*, 866 F.3d at 990-91 & nn. 9-10. Specifically, the circuit found that the trial court erred in giving a certain jury instruction and that the appellate court failed to recognize the error was of constitutional magnitude. *Id*. at 990. The circuit stated that the appellate court's determination otherwise was objectively unreasonable. *Id*. at 991.

In this case, the Court need not determine if the exclusion of the evidence was an error of constitutional magnitude. Assuming that the exclusion of the evidence was of constitutional magnitude and that the state court's determination otherwise was objectively unreasonable, Brown is still not entitled to habeas relief. Habeas relief on a trial-error claim is appropriate only if the error results in "actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht*, 507 U.S. at 637). Under the *Brecht* test for actual prejudice, "relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Mays v. Clark*, 807 F.3d 968, 980 (9th Cir. 2015) (quoting *Ayala*, 135 S. Ct. at 2197-98).

Considering the question of the harmless standard *de novo*, without deference to the California Court of Appeal's harmless-error analysis, Brown still cannot meet the exacting standard set forth above. A review of the evidence does not lead to grave doubt that the error had a substantial and injurious effect on determining the jury's verdict. Despite the trial court's error, a great deal of evidence regarding the victim's prior violent acts was heard by the jury to support Brown's self-defense claim. Brown testified that Michael Stillwell's daughter had told him about the victim's aggression and that Johnson had told him about the victim shooting Benson. *Brown*, 2016 WL 6744989, at *3. Brown also testified about the victim and others arming themselves and then blindfolding and kidnapping someone. *Id*. In addition to Brown's testimony about these incidents, Michael Stillwell testified about the victim assaulting him with a bottle, and Benson testified about the victim accidentally shooting him. *Id*. In closing argument, Brown's trial counsel also discussed the victim's violence towards others and Brown's fear of the victim.

14

Reporter's Transcript ("RT") at 763-66.

The only evidence that was excluded was statements that would have provided more information regarding the accidental shooting, the attack of Stillwell, and whether the kidnapping victim had been shot. The trial court's error in excluding this evidence as hearsay did not have a substantial and injurious effect. There was a great deal of evidence about Brown's reasons for fearing the victim and Brown has not shown that the additional evidence would have affected the verdict had it not been excluded. The jury heard from several witnesses who testified to hearing the parties talking before the shooting; the victim was unarmed when Brown shot him; and Brown had arrived at the house with a shotgun and wearing a bulletproof vest. For all these reasons, this claim is denied.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Brown argues that trial counsel was ineffective for failing to present certain arguments when the trial court excluded the evidence described above.

**Legal Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id*.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

**Discussion**

Brown raised this claim on direct appeal but argued that the state courts should only look to the merits of the claim if the court found that his evidentiary claim, discussed above, had been forfeited by trial counsel's actions. Answer, Ex. 4 at 46-47; Ex. 8 at 24-25. The California Court of Appeal, finding that the claim had not been forfeited, reached the merits of the evidentiary claim thus and did not address the ineffective assistance of counsel claim. Similarly, because this Court looked to the merits of the evidentiary claim, the ineffective assistance of counsel claim need not be addressed. Regardless, the Court has denied the evidentiary claim, so even if trial

15

counsel was deficient, Brown cannot demonstrate prejudice for the reasons set forth above. The claim is denied.

## CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, petitioner has made no showing warranting a certificate.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**. A certificate of appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated: July 31, 2018

JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MATTHEW AARON BROWN,

    Plaintiff,

v.

PARAMO,

    Defendant.

Case No. 17-cv-03948-JD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 31, 2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Matthew Aaron Brown ID: AW-1636
R.J. Donovan Correctional Facility D-19-127
480 Alta Rd.
San Diego, CA 92179

Dated: July 31, 2018

Susan Y. Soong
Clerk, United States District Court

By: *Lisa R. Clark*
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO